# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

_____ )

UNITED STATES OF AMERICA, *ex rel.*                     )
                                                        )
    DAWN M. KLOBUCHAR                                  )
    201 Riviera Terrace                               )
    Waterford, MI 48238                               )
                                                        )  **Case No. 13-14446**
          Plaintiffs,               )  **FILED UNDER SEAL**
                                                        )  Pursuant to 31 U.S.C. § 3730
    vs.                                               )  (False Claims Act)
                                                        )
MICHIGAN JEWISH INSTITUTE                                )
    6890 West Maple Road                              )
    West Bloomfield, Michigan 48322                   )  **JURY TRIAL DEMANDED**
                                                        )
 Serve Registered Agent:                                )  **DO NOT PLACE ON PACER**
    RABBI KASRIEL SHEMTOV                              )
    6890 West Maple Road                              )
    West Bloomfield, Michigan 48322                   )
                                                        )
    and                                               )
                                                        )
CHABAD-LUBAVITCH OF MICHIGAN                             )
                                                        )
Serve Registered Agent:                                 )
    RABBI BEREL SHEMTOV                                )
    14100 West 9 Mile Road                            )
    Oak Park, Michigan 48237                          )
                                                        )
    and                                               )
                                                        )
 THE SHUL                                               )
                                                        )
Serve Registered Agent:                                 )
    RABBI KASRIEL SHEMTOV                              )
    6890 West Maple Road                              )
    West Bloomfield, Michigan 48322                   )
                                                        )
    and                                               )
                                                        )
FRIENDSHIP CIRCLE                                       )

1



Serve Registered Agent:      )
     RABBI LEVI SHEMTOV    )
     6892 West Maple Road    )
     West Bloomfield, Michigan 48322  )
      )
     and    )
      )
RABBI KASRIEL SHEMTOV    )
     6890 Maple Road    )
     West Bloomfield, Michigan 48322  )
      )
     and    )
      )
RABBI YUDI MANN    )
     6890 West Maple Road    )
     West Bloomfield, Michigan 48322  )
      )
     and    )
      )
RABBI DOV STEIN    )
     6890 West Maple Road    )
     West Bloomfield, Michigan 48322  )
      )
        Defendants.    )
      )
_____)

## RELATOR DAWN KLOBUCHAR'S SECOND AMENDED COMPLAINT

## INTRODUCTION

1.    *Qui Tam* relator Dawn M. Klobuchar ("Klobuchar" or "Relator"), by her attorneys, on behalf of the United States of America, files this complaint against Michigan Jewish Institute ("MJI" or "Defendant"), the Lubavich Foundation of Michigan ("the Chabad" or "Defendant"), The Shul (or "Defendant"), Friendship Circle (or "Defendant"),  Rabbi Kasriel Shemtov ("Shemtov" or "Defendant"), and Rabbi Yudi Mann ("Mann" or "Defendant"), collectively "Defendants", to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*-3730(h).

2

2.      Pursuant to 31 U.S.C. § 3730(b)(2), this second amended complaint must be filed *in camera* and under seal, without service on the Defendants. The second amended complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join this action.

3.      Defendants violated the FCA on five counts, which led to their unlawful and fraudulent retention of federal funds made available to educational institutions through the Higher Education Act of 1965, Title IV programs ("Title IV, HEA"), which is administered by the Department of Education ("DEd"). Defendants (1) knowingly present and continue to present fraudulent claims to the Government to receive Pell Grants; (2) knowingly used and continue to use false records to the Government to receive Pell Grants; (3) conspired to present and use falsified information to receive federal funding; (4) have not fulfilled their obligation to return the federal funds they have fraudulently received to the Government; and (5) retaliated against Relator for her protected activity, which includes inquiring about the fraudulent activity.

4.      Defendants had one singular goal: enroll as many students as possible, without raising a red flag, to maximize federal funds they received from the United States in the form of Pell Grants.

5.      To achieve this goal, Defendants enrolled actual and/or fictitious Israeli students at MJI and applied to receive federal Pell Grant funding without the students' knowledge or permission.

6.      Defendants submitted Pell Grant applications in the names of students who had no intention of signing up for MJI and even in the names of fictitious students.

3

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

7.      Not only do these students have no interest in attending MJI, or even do not exist, but also MJI does not conduct any classes on location, has no professors, and has no system of taking attendance, and does not provide students any educational content.

8.      All of MJI's courses are conducted online or as an alleged "parallel" study abroad course. A parallel course is "created" by MJI for students who want to study abroad in the United States through MJI, but the program is administered online or at the students' home yeshiva or seminary in Israel. **The students never leave Israel**.

9.      Per MJI's accreditations as a distance learning institute, MJI has to provide students fifty percent of the educational materials, while the yeshivas/seminaries provide the remaining fifty percent. However, MJI does not provide any educational content.

10.     In anticipation of an upcoming Accrediting Council for Independent Colleges and Schools ("ACICS") audit in February 2013, Defendants falsified their student records to attempt to pass the audit and maintain MJI's accreditations.

11.     ACICS is an accrediting organization for degree granting institutions, such as MJI. Once an organization becomes accredited by ACICS, it will have to maintain its accreditations. The ACICS conducts audits to ensure organizations are compliant with its regulations.

12.     Pursuant to the FCA, Relator seeks to recover on behalf of the United States any damages and civil penalties arising from Defendants' knowingly false and/or fraudulent certifications of eligibility to the DEd for its Title IV HEA program.  From 2007 through the present, Defendants knowingly falsified claims for payment by the Government in the form of Pell Grants, submitted the falsified claims to the Government to receive Pell Grants, conspired to defraud the government, and never returned the federal funds they fraudulently received.

4

Defendants' actions violate 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B), 31 U.S.C. § 3729(a)(1)(C), and 31 U.S.C. § 3729(a)(1)(G).

13.     Pursuant to 31 U.S.C. § 3730(h), Relator seeks to recover damages resulting from MJI's retaliation against her. MJI's retaliatory actions came directly after Relator made several protected disclosures regarding Defendants' fraudulent activity. Defendants' retaliation includes placing restrictions on Relator which diminished her ability to perform her job duties, Relator's constructive discharge, and MJI withholding her salary and bonuses.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 31 U.S.C. §§3730 and 3732.

15.     This Court has personal jurisdiction over Defendant MJI, pursuant to 31 U.S.C. §3732(a), because MJI is located in this District, and MJI regularly transacts business in this District.

16.     This Court has personal jurisdiction over Defendant the Chabad, pursuant to 31 U.S.C.  §3732(a), because the Chabad is located in this District, and the Chabad regularly transacts business in this District.

17.     This Court has personal jurisdiction over Defendant the Shul, pursuant to 31 U.S.C.  §3732(a), because the Shul is located in this District, and the Shul regularly transacts business in this District.

18.     This Court has personal jurisdiction over Defendant Friendship Circle, pursuant to 31 U.S.C.  §3732(a), because Friendship Circle is located in this District, and Friendship Circle regularly transacts business in this District.

19.     This Court has personal jurisdiction over Defendant Shemtov, pursuant to 31 U.S.C. §3732(a), because Shemtov is a resident of the State of Michigan.

20.     This Court has personal jurisdiction over Defendant Mann, pursuant to pursuant to 31 U.S.C. §3732(a), because Mann is a resident of the State of Michigan.

21.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a), and under 28 U.S.C. §§1391(b).

22.     Relator knows of no other complaints that have been filed against Defendants alleging the same or similar allegations. Relator is an original source as defined by the FCA.

## PARTIES

**A.     Plaintiff**

23.     *Qui Tam* Plaintiff Dawn M. Klobuchar is a citizen of the United States and a resident of the State of Michigan.

24.     Klobuchar has personal knowledge that Defendants (1) knowingly presented, or caused to be presented, and continue to knowingly present and cause to be presented, fraudulent claims for Pell Grants to the Government; (2) knowingly used, and continue to use, false records to submit fraudulent claims to the Government; (3) conspired to present and use fraudulent information to submit fraudulent claims to the Government in order to obtain Federal funds under Title IV of the HEA; and (4) knowingly did not return the federal funds they had fraudulently obtained to the Government. Also, MJI retaliated against Relator for pointing out that MJI was engaging in fraudulent activity in violation of the FCA.

25.     Klobuchar began working at MJI on October 5, 2012, as an IT Manager.  Prior to her employment with MJI, Klobuchar held a number of positions in the field of information technology.

26.     On April 28, 2013, Klobuchar was constructively discharged from MJI because she believed continuing her employment at MJI would be impossible without becoming complicit in Defendants' fraud.  Additionally, MJI had responded to Relator's continued complaints about Defendants' fraudulent activity by retaliating against her and systematically restricting her resources, making it increasingly difficult for her to do her job.  Her last day at MJI was May 7, 2013.

**B.     Defendants**

27.     Founded in 1994, MJI is a non-profit Jewish-sponsored independent institution with academic baccalaureate degree-granting programs.

28.     MJI offers a study abroad program, which allows Israeli students to take courses in America at MJI as the "host" school.

29.     MJI's primary office is located at 6890 West Maple Road, West Bloomfield, Michigan 48322.

30.     MJI operates out of a single building located at 19900 Nine Mile Road, Southfield, Michigan 48075, with administrative offices for approximately twenty administrative staff members.

31.     The Chabad-Lubavitch is a philosophy, a movement, and an organization with many branches. The Chabad-Lubavitch movement, a Hasidic movement, has it official headquarters in Brooklyn, New York. The Lubavitch Foundation of Michigan is Chabad-Lubabitch's regional chapter in Michigan, an active corporation, and considers the Shul one of its centers in West Bloomfield, Michigan.

32.     The Chabad founded MJI and MJI houses its Michigan chapter at the Shul.

7

33.     The Shul is the synagogue located at the Jack & Miriam Shenkman Building. The Shul and MJI share the same address and are one in the same entity: 6890 West Maple Road, West Bloomfield, Michigan 48322.

34.     Friendship Circle is a non-profit organization that provides assistance to families and individuals with special needs. Friendship Circle is located at 6892 West Maple Road, West Bloomfield, Michigan 48322.

35.     Friendship Circle is affiliated with the Chabad-Lubavich organization and the Chabad considers Friendship Circle one of its centers in West Bloomfield, Michigan. Friendship Circle owns the West Maple Road building that MJI and the Shul list as their address. Friendship Circle leases land to the Chabad.

36.     Rabbi Kasriel Shemtov is the President and primary decision maker at MJI.  He is also the registered agent of MJI. The registered agent of the Chabad, Rabbi Berel Shemtov, is Rabbi Kasriel Shemtov's father.

37.     Shemtov is the Executive Director of Mayanot Institute of Jewish Studies, a prestigious organization in Israel that facilitates free "birthright" trips to Israel to over 380,000 Jewish youth around the world, and also operates many yeshivas and seminaries in Israel.

38.     Mann ("Mann"), MJI's Marketing and Study Abroad Manager, coordinated the partnership between MJI and the yeshivas and seminaries in Israel. Shemtov, with the help of Mann, orchestrated and at the time of this filing continues to facilitate the study abroad scheme that led to MJI defrauding the Government of $40,687,552 by submitting falsified Pell Grant applications, starting in 2007 and continuing to the present. The operations of these six co-Defendants are so intertwined that they are effectively one single enterprise. The relationship among the defendants is demonstrated in the chart below:

8

**Chabad-Lubavitch**
(Headquartered in Brooklyn, NY)



**Lubavitch Foundation of Michigan**
Registered Agent: Rabbi Berel Shemtov



**Michigan Jewish Institute**
6890 West Maple Road
West Bloomfield, Michigan 48322
Registered Agent: Rabbi Kasriel Shemtov

**The Shul**
Synagogue at the Jack & Miriam
Shenkman Building
6890 West Maple Road
West Bloomfield, Michigan 48322
Registered Agent: Rabbi Kasriel Shemto

**Friendship Circle**
6892 West Maple Road
West Bloomfield, Michigan 48322
Registered Agent: Levi Shemtov

9

## THE FALSE CLAIMS ACT

39.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes knowingly presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

40.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes knowingly making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

41.     The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 to $11,000 per claim.

42.     The FCA, 31 U.S.C. § 3729(a)(1)(G), makes knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transit money or property to the Government a violation of the FCA.

43.     The FCA, 31 U.S.C. § 3730(h), considers an employer's discharge, demotion, suspension, harassment, or any other discriminatory actions against the employee because of the employee's lawful actions a violation of the FCA.

10

44.     For all unlawful conduct for which Defendants are liable that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1), (2) and (7).

### THE HIGHER EDUCATION ACT AND TITLE IV

45.     The federal government distributes funds under Title IV of the HEA, 20 U.S.C. § 1094, to assist with the costs of secondary education.  To receive federal funds under the HEA, schools must enter into a Program Participation Agreement ("PPA") with the DEd, promising to abide by a host of statutory, regulatory, and contractual requirements.

46.     The PPA is an agreement with the Secretary of Education and sets forth a number of requirements that an institution must meet in order to receive federal funds under Title IV of the HEA:

> The agreement shall condition the initial and **continuing eligibility** of an institution to participate in a program upon compliance with the following requirements ... (3) The institution will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students . . . ( 5) The institution will submit reports to the Secretary ... containing such information as the Secretary may reasonably require to carry out the purpose ... (20) The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance . . . (21) The institution will meet the requirements established by the Secretary and accrediting agencies or associations ... (22) The institution will comply with the refund policy established pursuant to section 1091b of this title.

20 U.S.C. § 1094(a) (Emphasis added)

47.     To qualify for a Pell Grant, which is federal grant money disbursed under Title IV of the HEA, students must meet financial eligibility requirements. Among the requirements, a student must: (a) be enrolled and working towards a degree or certificate in an eligible program; (b) be a citizen of the United States or an eligible noncitizen; (c) have a valid Social Security Number; (d) certify that he/she will use federal student aid only for educational purposes; and (e) male students must be registered with the Selective Service. 20 U.S.C. § 1091.

## FACTUAL ALLEGATIONS

**A.     MJI Background and Enrollment of Israeli Students**

48.     Since its founding in 1994, MJI had a continuing enrollment of only a few hundred students.

49.      Starting in 2007, MJI began creating schools in Israel and the number of *enrolled* students at the Michigan location jumped to a few thousand.

50.     The reason for this significant jump in enrollment numbers was a partnership between MJI and yeshivas and seminaries in Israel. A yeshiva is a Jewish educational institution for men, which focuses on religious texts; a seminary is the yeshiva equivalent for women.

51.     Mann, MJI's Marketing and Study Abroad Manager, represented MJI in Israel, and established contracts between MJI and the yeshivas/seminaries in Israel so that the yeshivas/seminaries would be enrolled in MJI's study abroad program.

52.     As agents of MJI, Mann and twenty-five to thirty other recruiters approached the yeshivas and seminaries in Israel.  Mann and the recruiters committed to enrolling to study abroad through MJI every student who applied. The agents would then apply for a Pell Grant on behalf of the students without the students' knowledge.

53.     MJI would split the Pell Grant proceeds with the yeshiva or seminary - half would go to MJI and half to the yeshiva or seminary. In some cases MJI would agree to facilitate finding a state-side study abroad program with a "host school" other than MJI. None of the Pell Grant was ever applied to the individual student's tuition or study abroad fees.

54.     The Israeli yeshiva and seminary students largely speak Hebrew. Therefore, they relied on MJI's agents to translate the application documents for MJI.

55.     In their sales pitch to students, agents of MJI lied to the yeshiva and seminary students and told them that Pell Grants were automatically available to all students attending a school in the United States, even though that is not true.

56.     Based on conversations with Lyne Graham ("Graham"), MJI's Human Resources Manager, Relator determined that MJI was paying brokers and recruiters a commission based on the number of students they were able to enroll in Pell Grant funding.

57.     On or about early November 2012, Graham disclosed MJI's commission-based recruitment practice to Klobuchar. Graham said that MJI planned to suspend it in preparation for the audit. However, Mann continued this practice into November 2012 and was caught by Moshe Klein ("Klein"), MJI's former Chief Operations Officer, who disclosed Mann's fraudulent practices in the November management meeting.

58.     Mann was never disciplined by MJI for his fraudulent practices.

59.     The more yeshiva/seminaries and students Mann enrolled in MJI's study abroad program, the more compensation he received from MJI. Mann received a percentage of the total amount of the study abroad students' tuition, paid for by Pell Grant funds.

60. Regardless of whether a student intended to sign up for classes at MJI, MJI registered the student and applied for Pell Grants using names of students who had shared their contact information with MJI during Mann's recruiting trips to Israel.

61. Defendants acquired the names and demographic information of real individuals through the partnerships MJI established with yeshivas/seminaries in Israel and through Shemtov's access to databases containing names and demographic information of tens of thousands of individuals. Defendants then used said names and demographic information to submit FAFSA applications that appeared to be valid because the information used was valid. Defendants engaged in identify fraud when they stole the said names and demographic information and falsified FAFSA applications without the knowledge or consent of the individuals.

62. MJI also invented fictitious students whom they "enrolled" in MJI's study abroad program and submitted Pell Grant applications for.

63. MJI's fraudulent enrollment and Pell Grant application process was made easy by the "electronic" signature required on each form. Pell Grant applications only require the applicant's name typed on a signature line. MJI fraudulently entered students' names as electronic signatures without the students' consent of knowledge.

64. MJI began processing fraudulent enrollment application documents in batches of hundreds. MJI accepted 100 percent of these students through an automatic approval protocol on a nightly basis.

65. MJI also began processing fraudulent Pell Grant applications in bulk.

66. MJI has no physical classrooms; no classes on location; no professors on location in Michigan; no system of taking attendance; no system of maintaining grades.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

67.     All of MJI's courses are conducted online or as a "parallel" study abroad course. A parallel course is "created" by MJI for students who want to study abroad in the United States through MJI, but the program is administered online or at the students' home yeshiva or seminary in Israel. **The students never leave Israel**. Nevertheless, MJI fraudulently applies for Pell Grants for these students.

68.     MJI explained to Relator that the yeshivas were "host schools" and an extension of MJI, which made the yeshivas and seminaries US schools and therefore eligible for Pell Grant funds.

69.     Relator visited the websites for some of the "host schools" MJI had partnered with. The "host schools" advertised "Free US Money" to attend religious studies. These websites added that no commitment to MJI was required except some paperwork. MJI lists forty institutions in Israel as study abroad participating schools. For example, Halichos Bais Yaakov Seminary advertised on its website that "Halichos students who are accepted into the MJI Study Abroad program are eligible for United States Federal Aid in the form of PELL Grants."

70.     These Israeli students, who were signed up without their knowledge or consent, do not meet the Pell Grant eligibility requirements because:

    a.  They are not US nationals or eligible non-nationals.

    b.  MJI never acquired transcripts for these students to ensure that they had a high school diploma or an equivalent. Several hundred students are missing transcripts.

    c.  Several hundred students are missing Social Security Numbers. Relator believes that the Social Security Numbers associated with the fictitious students made up by MJI belong to others because the dates of birth linked to some of the Social Security Numbers date back to the 1930s.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

      d.   The Israeli males are not registered for the U.S. Selective service.  In fact, they

have a two-year commitment to the Israeli military.

71.     MJI's study abroad department is separate from MJI's admissions department.

The study abroad department handles its own admissions of Israeli students.

**B.     Relator Start Working at MJI**

72.     In October 2012, within a month of her employment at MJI, Relator grew

suspicious of MJI's practices. She discovered that MJI was creating fake accounts for fake

applicants using fake information. MJI would then receive Pell Grants for these same students.

73.     Relator discovered that the applicants were missing transcripts, had fake email

addresses with invalid domains, incomplete addresses, or were otherwise missing information

that was required for a complete application such as Social Security Numbers.

74.     Relator's access to a web-based database, Long Jump, demonstrated where MJI

stored the information of the students Mann's staff had recruited in Israel.

75.     Relator's raw data reveals that several hundred students were enrolled in classes

well after the semesters began either in September or January.

76.     Even through students were being enrolled weeks and months into the traditional

academic semester, the students were paying full tuition and receiving full credit on the

traditional academic calendar. The addresses and phone numbers for the new students were from

Israel.

77.     Relator could see that there were mass updates being performed on Long Jump

and hundreds of students were added to MJI's roster at a time.  These mass updates alarmed

Relator who knew that MJI could not possibly be simultaneously enrolling so many students

mid-semester.

78.     While MJI was adding students to Long Jump mid-semester, MJI was creating Pell Grant applications reflecting that the students had begun at the beginning of the semester. MJI was essentially maintaining two sets of conflicting records: the "true" enrollment patterns captured in Long Jump and the falsified Pell Grant applications.

79.     MJI's billing process was even more difficult because MJI had forged Israeli students' electronic signatures on enrollment agreements that provided for a distribution of the Pell Grant funds first to MJI and then to the non-existent "host" school. The students never received any portion of the grant funds.

80.     As part of her work, MJI gave Relator access to the online classroom environment, Sakai, which was used to conduct classes.

81.     Dov Stein ("Stein"), Director of Academics at MJI, explained to Relator that the students in the Sakai classes frequently spoke no English even though the classes were conducted in English, causing Relator to question the value of the services MJI was providing.

82.     MJI contended that students at the yeshivas and seminaries received "study abroad" credit for any classes taught at the yeshivas and seminaries.

83.     MJI created a fake certificate program for all the fictitious study abroad students called the Judaic Studies Certificate, under the Judaic Studies major, and enrolled all the fictitious students in that program. Originally the certificate program was a one-year program, but MJI extended it to a two-year program because it ensured more Pell Grant funds.

84.     Even though some of these students were enrolled in the two-year Judaic Studies Certificate program starting in 2008 and should have completed the program in 2010, MJI presently lists them as active students in its records and receives Pell Grants. Relator has raw date of thousands of these student records.

17

85.     During November 2012 management meeting within a month of starting at MJI, Relator learned that MJI was concerned about reconciling the Long Jump records showing mid-semester, mass enrollment, with the Pell Grant applications that showed a more orderly enrollment pattern -- and how it would explain the discrepancies to ACICS in the upcoming audit.

**C.      MJI Enrolls Yeshiva/Seminary Students with the Students' Consent or Knowledge**

86.     Per Shemtov's instructions, Yudi Mann ("Mann"), MJI's Marketing and Study Abroad Manager, coordinated the partnership between MJI and yeshivas/seminaries in Israel.

87.     As agents of MJI, Mann and twenty-five to thirty other recruiters approached the yeshivas/seminaries in Israel.

88.     The partnership between MJI and the yeshivas/seminaries meant that the yeshivas/seminaries would share their students' names and demographic information, including but not limited to full names, addresses, phone numbers, Social Security Numbers, with MJI. Mann and his recruiting team would then falsify MJI enrollment forms and FAFSA applications and sign them electronically in Israel, essentially committing identity fraud.

89.      In return for the information the yeshivas/seminaries shared with MJI, MJI would split the Pell Grant proceeds with the yeshiva/seminary - half would go to MJI and half to the yeshiva or seminary.

90.     As of 2008, MJI worked with 203 yeshivas and seminaries in Israel to "enroll" students in its study abroad program.

91.     Once Mann's staff in Israel acquired names and demographic information of students, they upload that information into Long Jump.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

92.    Relator observed that Mann's team in Israel routinely made mass updates to the Long Jump data, adding tens and hundreds of students at a time.

93.    When Mann's team successfully struck a deal with a yeshiva/seminary to get the names and demographic information of its students, they would then upload the information of all of those students at the same time.

94.    MJI created an assembly line to facilitate its scheme to defraud the government. The first half of the operations took place in Israel. First, Mann and his recruiters would approach yeshivas/seminaries and enter into partnerships with them to purchase, in whole, demographic information of students at the yeshiva/seminary.

95.    Mann's team included three Senior Study Abroad Recruiters, Yacov Epstein, Chaya Jacobowitz, and Avrohom Kryschek, all of who report directly to Mann.

96.    The role of Mann's team was to recruit schools as well as students.

97.    Then, Mann's team would complete the MJI enrollment forms and FAFSA applications the "students." The second half of the operations took place at MJI in the United States. As the Director of Admissions and Financial Aid at MJI, Peters would then enroll all the students based on the applications submitted by Mann and his team. This process took place weekly, with MJI enrolling students up until the very end of each semester.

98.    Defendants enrolled several hundred students in classes well after the semesters began either in September or January.

99.    Even though students were being enrolled weeks and months into the traditional academic semester, the students were paying full tuition and receiving full credit on the traditional academic calendar. The addresses and phone numbers for the new students were from Israel.

19

100.     Defendants enrolled entire yeshivas/seminaries at a time in MJI's study abroad program. For example, Mann signed up 27 students at Azmara in Israel and overnight the students were enrolled at MJI.

**D.     Defendants Enroll Mayanot Birthright Participants without the Participants' consent or Knowledge**

101.     Shemtov is also the Executive Director of Mayanot Institute of Jewish Studies ("Mayanot"), a prestigious organization in Israel that facilitates free "birthright" ten-day trips to Israel to over 380,000 Jewish youth around the world, and also operates many yeshivas and seminaries in Israel.

102.     Several post birthright trip options exist. Mayanot has a Post-Birthright Study Program, which extends the ten-day birthright trip to a month-long stay in Israel. Another option is for individuals to extend their travel to Israel for a year to attend a yeshiva/seminary. Many of the yeshivas/seminaries that allow students to study at their institutions for a year fall under the Mayanot umbrella or part of the larger Chabad Lubavitch umbrella.

103.     Mann's recruiting team approached the yeshivas/seminaries affiliated with Mayanot and the Chabad and used the existing partnership between these yeshivas/seminaries and Shemtov and the Chabad to acquire names and demographic information for more students to enroll in MJI's study abroad program in order to receive fraudulent Pell Grant funds.

104.     Shemtov, as the Executive Director of Mayanot, abused his access to Mayanot's database of names, addresses, Social Security Numbers, and other demographic information and Mann's team used that information to falsify FAFSA applications.

**E.     Management Meetings**

105.     At the time Moshe Klein ("Klein") was MJI's Chief Operations Officer, each department manager at MJI met individually with him on a weekly basis, followed by a management meeting with the full management team.

106.     Each week, at the management meeting, there was a heated discussion because the recruiters had generated hundreds of students with submission IDs, but some employees believed it was improper to try and enroll so many new students mid-semester.

107.     Rabbi Aaron Hurwitz and Rabbi Hillel Rudolph, representatives from yeshivas in Israel, informed Klein that some of the Israeli students enrolled in MJI's study abroad program were not actually aware of their affiliation with MJI or taking MJI classes. After further investigation, Klein found out that, in fact, MJI was enrolling fictitious students and fraudulently receiving federal funds.

108.     In November 2012, at a weekly management meeting, Klein announced that MJI had fraudulently obtained Pell Grants for several host schools in Israel.

109.     After the meeting, Graham asked Relator to join her for a cigarette break. Graham disclosed to Relator that Mann was responsible for enrolling entire schools in Israel in a scheme to receive more Pell Grant funds.

110.     Graham said that this was not the first time Mann had devised a scheme to receive Pell Grant funding. Instead, it was standard practice for MJI to fraudulently receive Pell Grant funding.

111.     Klein announcements and Graham's statements prompted Relator to investigate the matter herself.

112.     Relator learned that in November 2012, more than halfway through the semester that started in September and would end in December, MJI had opened four new schools in

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

Israel with a total of 233 students. In a matter of hours, MJI processed and approved the enrollment form for each of the 233 student. MJI then applied for and received Pell Grants for these students.

**F.   December 2012 Meeting**

113.     On or about December 17, 2012, Relator met with Fran Herman ("Herman"), MJI's Financial Aid Administrator, at Herman's desk to say hello. While at Herman's desk, Relator heard Herman say that "Pell" had stopped payments for MJI students whose records were missing or incomplete. It was Herman's duty to investigate the issue and locate the missing student records.

114.     Herman told Relator that Klein micromanaged the financial aid and finance department so much that it reduced productivity.

115.     Herman showed Relator an Excel workbook for a freshman student who was receiving federal aid and was taking senior level classes without any supporting documents, like transcripts, to show that the prerequisites were met.

116.     Herman told Relator that Klein had instructed Herman much earlier to "bill Pell" monthly for a capped amount so that no red flags would be raised.

117.     Pell Grant funds are disbursed to educational institutions through third-party processors. MJI received its Pell Grant funds through a third-party processor named Gemcore. Per Klein's instructions, Herman was to withdraw a specific amount of Pell Grant funds through Gemcore monthly.

118.     Klein asked Relator to sit in on a meeting with Rebecca "Becky" Peters ("Peters"), MJI's Director of Admissions and Financial Aid, on the morning of December 17, 2012.

119.     During the December 17, 2012 meeting, Peters said that student records had been altered to facilitate the funding of classes taken by Pell Grant recipients. Peters added that Karen Henry ("Henry"), MJI's former Registrar, and Stein regularly altered student records via Microsoft Excel workbooks to match what MJI was billing Pell for financial aid.

120.     During the December 17, 2012 meeting, Peters said that after the mass enrollments through Long Jump, Henry and Stein would initially assigned students to any class regardless of pre-requisites or course level. Then, Peters and Herman would go back into Long Jump and change the classes in the students' records to match the courses listed on the Pell Grant applications.

121.     The December 17, 2012 meeting came about after MJI, via direction from Klein, revoked Relator's and Peters' access to make the changes to student records. The only persons with access were the registrar's office. Peters was angry and demanded to have access again. Peters emphasized to the Relator that these changes needed to be made as soon as possible to prepare for the upcoming ACICS audit. Peters further explained that the financial aid staff and academic staff started this practice in 2007 and this practice only stopped recently. Peters mentioned that the changes needed to be made prior to the ACICS accreditation audit.

122.     During the December 17, 2012 Peters added that if students' records could not be changed, MJI would have to return federal funds. Peters said that ACICS encouraged these changes, did not want to know about them, and only cared if MJI had clean records.

123.     After the December 17, 2012 meeting with Peters, Relator met with Klein in his office to discuss the seriousness of the situation at MJI. Klein informed Relator that he, Graham, and Kathy Humpert, MJI's part-time special projects assistant, made a call to ACICS, with Klein in the office, to ask for clarification regarding changing student records and that ACICS

23

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

informed them that all changes required full documentation, dates, and signatures. Shemtov was angry at Klein for making the call to ACICS, because Shemtov worried that it would raise a red flag.

124.    After Relator's December 17, 2012 meeting with Peters, Relator realized that Shemtov had tasked Peters and Herman with changing Excel workbooks assigned to each student. Relator also saw notes in Long Jump as to the progress of Pell Grant applications and distribution of funds to "host schools."

125.    On or about December 21, 2012, Relator requested a meeting with Shemtov. During the meeting, Relator told Shemtov that the data she had reviewed to date showed that MJI was engaging in fraud.

126.    During the December 21, 2012 meeting, which lasted over an hour, Shemtov tried to explain that everything was proper and legal. He said that anything Relator thought was fraud was probably a mistake and that MJI was working to fix these issues.

127.    During the December 21, 2012 meeting, Shemtov further explained that Peters had reviewed all the documents and files and that MJI would return any unearned funding to the government.

128.    During the December 21, 2012 meeting, Shemtov also explained to Relator that Klein would not be returning to MJI and asked that Relator block Klein's access to all MJI accounts, including email and network access.

129.    MJI never returned any money to the federal government.

## G.    Klein Leaves and Leeb Starts

130.    Within ten days of Relator's December 21, 2012 conversation with Shemtov, Klein left MJI.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

131.    Relator learned that Klein had told MJI that he thought MJI's practices were illegal. During a meeting with Relator regarding MJI's billing practices, Klein stated that she might be onto something. But, somebody would have to pay for it [the illegal billing practices], but it would not be Shemtov.

132.    Relator also learned that Klein had received a severance package with a confidentiality clause.

133.    Before leaving MJI, Klein, or somebody using his account, had ordered the mass deletion of all MJI data on Long Jump.

**Moshe Klein added a note**

12 days ago via the web

LongJump Support                                                    Page 5 of 6

Again, I did not delete any records. There must be some trigger for this. Is there some way to identify this?

**Janhavi Wagle sent an email**

12 days ago via email

The database shows your name on the deleted records.

Janhavi

**Moshe Klein added a note**

12 days ago via the web

Just made that change. But who put those items in the deleted records?

134.    On or about December 28, 2012, Fred Leeb ("Leeb"), MJI's new Chief Operating Officer, came into the office.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

135.    Leeb immediately avoided Relator and even cancelled their required weekly management meetings.

136.    On or about January 3, 2013, Klein locked all MJI staff out of Long Jump. Relator worked with Long Jump staff to get all MJI data released and per Mann's request she built a database in Salesforce, another online content records management system. Leeb revoked Relator's to access Salesforce after she created the database.

**H.    Campus Academic Management System ("CAMS") and Modification Requests**

137.    When MJI hired Relator to perform all IT managerial duties in October 2012, it was so that IT contractor Phil Klump ("Klump") could concentrate on implementing a new Campus Academic Management System ("CAMS"), prior to the audit. However, Klump refused to allow Relator access to CAMS. This impaired Relator's ability to complete the duties of her position. Klump reported directly to Shemtov.

138.    In November 2012, Relator discovered that Klump was falsely submitting hours for payment for work that Relator had performed.

139.    Relator brought this issue to Shemtov's attention. However, Shemtov instructed Relator to pay Klump for the falsified hours he had submitted.

140.    Relator further discovered that Klump had installed the $150,000 CAMS software on his own server, used the MJI credit card, and was billing MJI $275.00 per month per server, for his services. This practice increased Klump's revenues, but also restricted anybody, including Relator, from accessing technical support from CAMS creator, Three Rivers. Klump had instructed Three Rivers not to provide any information to anyone at MJI except for himself.

141.    In December 2012, Relator took the CAMS project off of Klump's servers and had it reinstalled on a host site she could access.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

142.     On or about December 21, 2012, with the Shemtov's approval, Relator instructed Klump that she did not require his services anymore.

143.     Shemtov then moved Klump to the Shul in West Bloomfield, where Klump was allowed to continue his practices of monitoring CAMS records remotely.

144.     Although MJI had bought and paid for CAMS in early 2012, it ultimately never implemented it.

145.     In the course of attempting to implement this system, Relator had various meetings with MJI management.

146.     Relator learned that CAMS could not integrate with MJI's systems because of MJI's fraudulent activity.

147.     MJI's practice of illegally splitting Pell Grant funds with the study abroad "host schools" – that were in fact Israeli yeshivas and seminaries -- was one reason why MJI could not use CAMS as intended.

148.     Further, the enrollment process in CAMS has a document tracking system that requires proof of identity, social security, high school or GED completion, and ACT and/or SAT scores. For a given student MJI was typically missing some or all of these records.

149.     MJI had problems with class registration on CAMS because students who had been enrolled in "parallel" courses at Israeli "host schools" had to be recorded as taking MJI classes, not equivalent courses. That meant that after the semester had started, MJI had to translate documents from the yeshivas and seminaries and enter them into the CAMS system. Because translating the documents took so long, MJI was often withdrawing Pell funds late after the start of the semester.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

150.    The CAMS system sets registration and add/drop periods for classes, triggers the financial aid process, and requires attendance records to allow the system to index the records.

Previously, MJI had been tracking student records on Microsoft Excel workbooks and could not transfer the information from Excel into CAMS.

151.    Herman and Peters explained to Relator that there was a 50/50 split of funds between MJI and the study abroad "host school" – which were actually the yeshivas and seminaries in Israel. When Relator told them that CAMS had no way to track the split because Pell Grants are not meant to be divided, Herman and Peters responded that there was no way to change MJI's policy of forcing students to assign Pell Grant funds to MJI and host schools.

## I.    MJI's Accreditations as a Distance Learning Institute

152.    MJI is accredited as a distance learning institute, making it responsible for providing fifty percent of educational content while another educational institution provides the remaining fifty percent.

153.    MJI study abroad students were enrolled in two online MJI courses and two courses at a yeshiva/seminary in Israel.

154.    MJI did not provide fifty percent of the educational content for its study abroad students.

155.    Rather than taking two MJI courses and two yeshiva/seminary courses, MJI's study abroad students took four classes at yeshivas/seminaries. MJI recorded all four courses as actual MJI courses.

156.    Each semester, Dov Stein, Director of Academics at MJI, was to designate which two courses MJI would offer online. However, he did not always do so.

157.    Often times the MJI staff in Israel would designate which two courses would be offered by MJI for a given semester.

158.    Once MJI's online courses were selected, the Israel staff would email Relator to create an online classroom on Sakai, MJI's online learning platform.

159.    Relator often created a course picked out by MJI's Israel staff and enroll the students in the class, only to get an email from the MJI's Israel staff asking Relator to change the course.

160.    Once Yudi Mann signed a contract with a yeshiva/seminary in Israel, the yeshiva/seminary became an MJI recognized school.

161.    MJI considered all host schools to be MJI campuses.

162.    The contracts between MJI and yeshivas/seminaries were never shared nor published within MJI.

163.    The yeshivas/seminaries were supposed to submit grades and syllabi to MJI for the classes MJI's study abroad students took at the yeshiva/seminary and MJI was then supposed to translate those documents and compile enough content to satisfy an MJI course. In reality, MJI provided the syllabi and made up the grades.

164.    MJI recorded the classes taken at the yeshivas/seminaries as MJI courses, not equivalent or transfer credits.

165.    The yeshivas/seminaries in Israel did not allow computer use, including computer use to access Sakai classrooms, without heavy content filtering.

166.    The students in Israel could not complete any classwork outside the yeshiva/seminary, as they are not permitted to use computers in their homes.

167.    MJI's liaisons were to teach via online lectures, either pre-recorded or in real time, to the study abroad students in Israel.

168.    Each liaison was responsible for the online content and instruction of multiple host schools.

169.    For the Fall 2011 semester, the student master list included 3,387 students, split between four liaisons: Esther Heller, Rabbi Hillel Rudolph, Rabbi Aaron Hurwitz, and Tzippora Price. The courses taught by these liaisons were for MJI's study abroad Judaic Studies Certificate Program.

170.    The study abroad students took different classes at the yeshiva/seminary than the designated MJI course for the semester. Regardless of the courses the students were enrolled in at the yeshiva/seminary, MJI recorded the courses as MJI courses, even if the course content did not match.

171.    MJI signed a contract with each yeshiva/seminary it enrolled in MJI's study abroad program in an attempt to make the yeshiva/seminary part of MJI and therefore part of an American ACICS accredited institution.

172.    The contract between MJI and the yeshivas/seminaries were never actually followed because the students took courses at the yeshiva/seminary that were different from the MJI online course they were enrolled in, which would have been reflected in the contract between MJI and the yeshiva/seminary.

173.    MJI issued student ID numbers after the registrar had acquired the necessary paperwork for the student. The necessary paperwork includes proof of identity, proof of completion of high school or GED, and completed financial aid applications. Some of these

documents were held by the study abroad department in Leeb's Michigan office, while the majority of these documents were kept in Israel.

174.    MJI enrolled entire yeshivas/seminaries and processed the paperwork for all of those students at once. Sometimes, MJI attempted to enroll all of students and submit financial aid paperwork for them, but Peters had to scramble to fit them in MJI courses. When MJI ran into this problem, it looked to a solution that would make these students MJI students and so MJI created the MJI Online New Program. In practice, students were enrolled in the same class for several consecutive semesters.

175.    The MJI Online New Program, which began in 2011, is separate from MJI's certificate earning study abroad program. Klump explained this program to Relator as a "special project."

176.    To be part of MJI's study abroad program and offer classes towards a certificate, a yeshiva/seminary needs to have a signed agreement with MJI that lists the courses the students are to take for a given semester. However, sometimes the yeshiva/seminary did not agree with MJI on the course content and as a result, the yeshivas/seminaries began teaching courses outside of the agreed upon contract. In these instances, MJI designated the students as MJI Online New Program, or MJI Online, and the students were no longer MJI study abroad students.

177.    In addition to MJI's study abroad program and it's the MJI New Online Program, MJI had several students designated as directed study or correspondence students.

178.    As correspondence students, these students had no syllabi or assignments, they were never assigned an instructor that they could check-in with, and they had no email communication with MJI. These students were enrolled in "special" 400-level courses. Relator recalls several first year students, or "freshman," being enrolled in these courses.

179.    Shemtov asked Relator to prepare a separate, stand-alone macro for his sole use so that he would be able to identify these students. Relator did as she was told but has no knowledge of what Shemtov did with that information.

**J.      MJI Did Not Provide Course Content for Its Online Courses**

180.    In 2008, MJI adopted Sakai as its online learning platform, where MJI would be able to create an online learning classroom.

181.    Sakai is an open source software and offers a complete list of tools for online instruction.

182.    Each course is referred to as a worksite within Sakai, and should be maintained by the instructor.

183.    Starting December 12, 2012, MJI began using Longsight for internet web site hosting of Sakai.

184.    Before transferring Sakai to Longsight, Klump had the CAMS and Sakai servers in an undisclosed location. Klump refused to share the location of the servers with anyone at MJI.

185.    A Sakai online classroom allows for instructors to upload videos and stream videos in real time, via Big Blue Button.

186.    Big Blue Button enables instructors to deliver educational materials to the classroom of online students and create a virtual classroom.

187.    Instead of offering many sections of the same course, which is the customary practice for educational institutions, MJI required Relator to create two copies of separate courses for each host school, one for male students and one for female students.

188.     Depending on the class size, MJI required Relator to create multiple Sakai classes for the same course for the same host school. Doing so would allow for a lower instructor-to-student ratio.

189.     Stein, Mann, Klump, and Klein each told Relator that MJI had purchased a large number of computers for Israel because the students in Israel were Orthodox, were sheltered, and had no knowledge of technology.

190.     Yeshivas/seminaries applied content filters to any internet capable device so the students could only view very limited content.

191.     A Sakai online classroom is equipped with a tool named "resources." Instructors uploaded links to documents they wanted their students to view under Sakai's resources section. These resource links allowed students to access outside websites. Relator never received any requests to modify filters to allow students to access the external links. Because of the filters in place, the students were unable to access any external materials.

192.     When MJI moved the physical location of the Sakai server to Longsight and installed a security certificate, all the filters needed to be modified to access the new URL.

**K.     MJI's Bandwidth Usage**

193.     When MJI hosted Sakai, Big Blue Button, and CAMS on its own servers, before MJI began using third-parties to host these programs, MJI did not have enough bandwidth available to support instructors uploading anything to their Sakai online classrooms.

194.     Sakai and Big Blue Button both require significant upstream and downstream bandwidth.

195.     When MJI hosted Sakai, Big Blue Button, and CAMS on its own servers, MJI was using the bandwidth it had through the internet services it subscribed to through Comcast

Business. That bandwidth supported a maximum of sixteen megabits per second for downstream and even less for upstream.

196.     Big Blue Button recommends at least one hundred megabits per second bandwidth for both upstream and downstream.

197.     MJI's limited bandwidth did not support large number of students MJI was enrolling in addition to MJI faculty and staff.

198.     Given the bandwidth MJI had available, it was not possible for MJI to use Big Blue Button until January 2013, when Relator began using Longsight as the host site for Sakai and Big Blue Button.

199.     Relator repeatedly asked Shemtov to allow her to move Sakai, Big Blue Button, and CAMS to third-party host sites. After a series of vehement objections, Shemtov agreed.

200.     Relator moved the CAMS server to Hostway.

201.      MJI used Three Rivers, creators and developers of CAMS, for technical support and project management for CAMS.

202.     Big Blue Button offers several tools: record and playback, whiteboard, presentation, webcam, and desktop sharing are the tools that were available to MJI. All of the mentioned Big Blue Button tools require a live session between the students and instructors. The only tool that does not rely on students being present is the record and playback tool. The record and playback tool allows for instructors to record and upload lectures to their online classrooms so that students can later access them. However, MJI used this tool very rarely.

203.     After the migration of these programs to third party host sites, MJI's liaisons in Israel were to begin using Big Blue Button.

204.     However, even with tutorials and Relator's extensive assistance, the liaisons did not use the Big Blue Button.

205.      In order for an instructor to upload a live session or a pre-recorded video to Big Blue Button, an instructor has to send a meeting invitation, which the students would receive via their MJI student email accounts. Relator, too, would have received a copy of the invitation because she was the administrator for Sakai and Big Blue Button.

206.     Relator received a notification for every course created, as requested by MJI's Israel staff, and also received email notifications when an instructor added any content to the online courses.

207.     Relator received a very limited number of notifications regarding course content creation for MJI's study abroad classes.

208.     In contrast, she received a large number of course content notifications for the courses offered to the sixty-three real students at MJI.

209.     Relator has emails for items such as announcements being added to online courses, but only has no email notifications for live sessions and pre-recorded sessions being uploaded.

210.     MJI' study abroad staff in Israel did not use Big Blue Button.

211.     Before Relator began working on Sakai in December 2012, MJI employed Phil Klump, Consultant from End User Technologies, to install the Sakai environment on the MJI computers in Michigan.

212.     Klump was unable to set up Sakai properly.

213.     From 2008 through 2012, MJI was used Sakai in a very limited capacity, and therefore did not hold any online lecture and never uploaded any educational content to the online classrooms.

**L.     Lack of Educational Content in Sakai Online Classrooms**

214.     MJI did not provide the fifty percent of educational content that it was responsible for per its accreditations.

215.     To set up a MJI online class via Sakai, MJI created roughly ten master classes with limited course content.

216.     MJI's staff in Israel would ask Relator to create additional courses by duplicating the master courses.

217.     When MJI first began using Sakai, instructors emailed Relator to upload course content to Sakai classrooms.

218.     MJI's study abroad staff never submitted requests to upload any videos.

219.     The only requests from instructors to upload videos came from Rhonda Gilbert, MJI's dual enrollment manager. Dual enrollment is a partnership between MJI and regional high schools in the United States that started in 2010 and allows high school students to take courses at the Shul for high school credit.

220.     Relator received queries from the Israel staff at all hours of the day. Consequently, Relator announced that course instructors were responsible for uploading their own course content to their Sakai classrooms and distributed detailed instructions for instructors to be able to upload their own videos and other course content.

221.     Thereafter, instructors then began contacting Longsight with requests to upload their content to the Sakai online classrooms. As a result, Longsight reached out to Relator, the

administrator on the account, asking her to put an end to the requests from MJI instructors. After sending this email, Relator did not see many instructors upload course content. In fact, MJI's study abroad program in Israel did not use Big Blue Button and did not upload any videos, whether in real time or prerecorded.

222.    Out of thousands of email notifications, the only course for which Relator received invitations for online sessions, whether pre-recorded or in real time, was for a welcome session to EDU 131 OL3 Winter 2013. This course was taught by Alissa Rothstein and was offered to MJI real sixty three students. EDU 131 had a "Welcome to EDU 131" session during week nine of the course.

223.    Relator never received a notification for a prerecorded video or an online lecture in real time for MJI's study abroad courses. The only notifications Relator received for MJI's study abroad courses were for the creation of the course, and sporadic announcements and resource links.

224.    MJI added courses and students until the very end of each semester and did not adhere to an add/drop period.

225.    On or about April 22, 2013, MJI added HIS 261 as a course for its winter 2013 semester that started in January and ended in May.

226.    MJI distributed its 2013-2014 Faculty Orientation Handout to its faculty, outlining its expectations of faculty and instructors. Per its Faculty Orientation Handout, MJI required that all communications between MJI faulty, students, and staff take place using a MJI email address, and that they communicate regularly.

227.    MJI faculty did not contact students via MJI email addresses. *See* Ex. 22, Email Accounts Created Versus Accounts Accessed. Additionally, MJI required:

37

228.    Per MJI's 2013-2014 Faculty Orientation Handout, MJI required its instructors to make available for their students and MJI's administrative offices, a complete set of all course handouts, including but not limited to syllabi, readings, or any additional information the instructors wished to distribute to students.

229.    MJI faculty did not have syllabi for the Sakai courses until close to the end of the semester or sometimes after the semester was over.

230.    On or about April 15, 2013, Relator received a Sakai notification that changes had been made to the syllabus content for CIS 122 OL1 for the winter 2013 semester, even though the semester had begun in January and was set to end in May.

231.    After the end of each semester, MJI translated the syllabi from the courses the students studied at their yeshivas/seminaries to create its own course syllabi.

232.    A large project in preparation for the ACICS audit was to create syllabi for each course MJI listed in its catalogue.

233.    After the audit, at the direction of Shemtov, Warren Frankford shredded the syllabi created in preparation for the ACICS audit.

234.    Per MJI's 2013-2014 Faculty Orientation Handout, MJI required that instructors log attendance, adhere to the add/drop period limited to the first week of courses, administer course evaluations, hold mid-semester reviews and end-of-year faculty reviews. MJI did not enforce any of the requirements it set out in its Handout.

## M.    ACICS Audit

212.    In a letter dated January 7, 2013, ACICS informed MJI that it would perform a Scheduled Site Visit on February 19-21, 2013.

213.    In preparation for the audit, Shemtov and Leeb asked Relator to write a macro that would scan the Microsoft Excel workbook MJI kept for each student to find errors or missing information. Relator wrote the macro and scanned all the files as directed. She found thousands of errors and missing fields in the student Excel files. Relator reported these findings to Shemtov and Leeb.

214.    By the end of January 2013, MJI was seeking to diminish Relator's role at MJI because she knew too much.

215.    MJI hired Bruce Fidler and James Jemison as help desk technicians. Although Fidler and Jemison were supposed to report to Relator, Leeb required all communications go through him instead of directly to Relator.

216.    During the second week of January 2013, Relator met with Shemtov. During the meeting, Shemtov informed Relator that she would not have access to data and that she would have to make specific requests for access going forward. This restriction seriously impaired Relator's ability to perform her job duties.

217.    From February 19 to 21, 2013, the ACICS conducted an audit of MJI's files over the past six years.

218.    In an effort to pass the ACICS accreditation audit, MJI staged a fake class with fake students as a show for ACICS. MJI paid employees and members of the community to sit and listen to a lecture. None of the attendees were actual students. Fred Leeb, Adam Leeb's son, was the instructor for the fake computer class being taught for the audit. Bruce Fidler of MJI's IT Department also taught a fake class that was set up for the audit. Two MJI employees had signed up for these fake classes thinking they would get college credit. MJI created this fake class because it did not have any students ever attending at their Michigan location.

219.     Relator has raw data with timestamps that reveal that MJI was making mass changes and corrections to student records up until the last day of the audit. Roughly 940 student records were part of a mass update that took place on December 30, 2012 between 13:30 and 14:30.

220.     Within weeks after the audit, Shemtov directed Leeb who, in turn, directed Warren Frankford ("Frankford") to shred all the fraudulent student files that MJI had created solely for the purpose of fooling the ACICS auditors. When Relator saw Frankford shredding documents, she asked why he was doing so. Frankford responded that the audit was over and that the records were no longer needed.

221.     Despite MJI's efforts, the audit did not go well. ACICS's audit report informed MJI that the audit was going to a review committee because of various deficiencies, including poor student records.

**N.     Lack of Student Activity on Sakai**

222.      In preparation for the ACICS audit, Relator had to go through every Sakai online classroom to document student activity to create library usage, a requirement for ACICS accreditations.

223.      Relator prepared a report for every Sakai online class to document how many times each link within the classroom had been clicked on.

224.     Relator employed two temporary employees, LaChante' Ambers-Turner and Star Kinloch, to help her with the task of going through roughly one thousand courses.

225.     While reviewing the courses, Relator saw some resource links. The resource links were links to the Torah and or passages from the Torah that the students had to read.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

226.    In reviewing the Sakai online courses, Relator saw several resource links via Koha, library software used by most libraries to interlink libraries, which directed students to religious studies articles.

227.    When reviewing the Sakai online courses, Relator saw some assignments, tests, and quizzes, most of which were incomplete.

228.    Roughly ten percent of the click count from every course belonged to assignments, tests, and quizzes. The ten percent includes instructor activity.

229.    Sakai's click count reports are unable to count clicks by distinguishing between unique users or date of access. Instead, the clicks are captured when someone, whether instructor or student, logs in and clicks on a link.

230.    MJI did not have any videos uploaded to any of it Sakai online courses.

231.    Each online course was to have a discussion board, where students and instructors could have an interactive learning experience and participate in discussions on topics selected by instructors.

232.    MJI's online courses had intermittent discussion on the discussion board on Sakai.

233.     In or about early fall 2012, the resource links in Sakai were not functioning and all the MJI staff in Israel and Michigan repeatedly clicked on the links to see if they worked. These clicks, too, counted as the Sakai activity that Relator was able to capture in her click reports, which inflated the results of the report.

234.    In a class of 50 students, it is expected to see a minimum of 50 clicks and that was not the case.

235.    Relator's reports captured nine or ten clicks for most classes and some classes reported no clicks.

41

236.     For an instructor to stream a live video to the Sakai online classroom, the instructor would have had to send out a Big Blue Button invitation, including a link or phone number for students to access the video. Invitations would have been sent to student MJI email accounts.

237.     The purpose for the live video feeds is to create an interactive learning environment online that would be similar to an interactive in-person experience.

238.     As the administrator of Sakai, Relator would have received a copy of the invitation as well.

239.     Of the 4,684 MJI.edu student email accounts created, only 1,276 were ever accessed. MJI had to communicate with its students using the students' MJI.edu student accounts. More than half of MJI's study abroad students never received any invitations for Sakai videos because they never activated their student email accounts, even if the instructors uploaded any videos.

240.     Additionally, instructors did not use Sakai's gradebook component to track students' grades. Instead, they recorded a final grade for the students in the Excel spreadsheets MJI used to track its students.

241.     Relator incorporated a course survey, an ACICS requirement, into Sakai and set it up so that a student would have to take the survey before the final exam would be released to them. Stein grew furious and yelled at Relator to remove the survey. Stein told Relator that she had no place in deciding how course surveys should be handled.

242.      MJI's study abroad students did not receive any educational content via Sakai.

243.   MJI's study abroad students did not have consistent interaction via Sakai as evidenced by the difference in the Sakai online classes for the study abroad students and the sixty-three real MJI students who are handled through the MJI registrar's office.

244.   The courses in which the real sixty-three students were enrolled included business, accounting, computers, education, and mathematics courses. These courses had regular assignments, tests, quizzes, discussions, as well as pre-recorded and live videos.

245.   As the administrator of Sakai, every time an instructor uploaded materials to his or her Sakai classroom, Sakai sent an automated email to Relator.

**O.    MJI Did Not Provide Fifty Percent of Its Students' Educational Content As Mandated by Its ACICS Accreditations**

246.    As an accredited distance learning institution, MJI had to provide fifty percent of the educational content to its study abroad students.

247.   MJI did not provide fifty percent of the education content to its study abroad students. MJI did not provide any educational content to its study abroad students via Sakai or any other platform despite claiming to offer two online courses each semester.

248.   MJI's study abroad registrar's office in Michigan picked through the subject matter taught in Israel week by week, or at the end of each semester, to put together enough content material to qualify that the students took the designated MJI class.

249.   MJI hired translators to translate the course syllabi from the students' yeshiva/seminary course and match the course with an MJI course.

250.   Sometimes when after the end of the semester, based on the content that the Registrar's office saw in the syllabus of the host school, MJI changed the MJI online course the student was enrolled in so that the content the students were taught at the host school would

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

match the syllabus that MJI had developed for its courses. Sometimes, MJI changed its syllabus altogether, to match the syllabus of the course at the host school.

251.    During an MJI management meeting on April 18, 2013, Mann said that a study abroad student could receive a MJI certificate without ever taking a MJI course.

**P.    MJI Defrauded ACICS Auditors**

252.    MJI defrauded ACICS auditors by claiming that it held in-person classes in Michigan.

253.    When the auditors arrived at MJI in February 2013, Shemtov and Stein informed them that MJI classes were taught in classrooms at the Shul during the day and at the yeshiva in Oak Park, Michigan until midnight.

254.    Anticipating that the ACICS auditors would ask to see classes that were taught in person, Shemtov staged a fake MJI computer class for the auditors.

255.    MJI paid employees to sit in on the MJI computer class lecture and pretend to be students.

256.    The fake course was taught by Bruce Fidler, an assistant in MJI's IT Department.

257.    No real students attended the fake computer course taught by Fidler.

258.    MJI created this fake computer course because no real students ever attended MJI's Michigan location.

**Q.    CAMS Implementation**

259.    When MJI completed the purchase of the CAMS software from Three Rivers in August 2012, it did not cooperate with Three Rivers and so MJI was not able to begin the process of implementation until December 21, 2012, when Relator was put in charge of the project.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

260.    When making the purchase, MJI told Three Rivers that it only needed CAMS for roughly seventy students.

261.    It was not until the project management team arrived at MJI to develop a timeline for the implementation of CAMS that MJI revealed that it planned to use CAMS for its study abroad students, a total of roughly five thousand students.

262.    Before Relator was tasked with implementing CAMS, Phil Klump worked on the project.

263.    In March 2013, Sandra Lafata, the Three Rivers Project Manager assigned to MJI, flew to Michigan to set up a three-day training session where Esther Hirschberg, Judy Lane, Amy Herskovitz, and Lisa Gallerini of the study abroad registrar's office and Alicia James, Ricca Escamilla, Dianne Bernard of MJI's main registrar's office were to bring hard student files and enter all of the data for the 2012-2013 academic year because the Excel spreadsheets MJI used to track its students were not convertible.

264.    However, this data entry never took place.

265.    The March 2013 CAMS training session was the second session designated for CAMS training with the Project Manager, with the first being conducted in December 2012 by Phil Klump.

266.    Initially, MJI hired End User Technology, of which Klump is a co-owner along with his brother, in January 2010 for thirty days. Klump billed MJI an average of sixty hours a week at the rate of $50.00 per hour. He had full use of the MJI credit card, which he used to purchase hardware, software and other IT related items that were never shipped to MJI. Instead, he set these items to install the new CAMS servers (SQL and IIS) as well as Sakai in an undisclosed location, with him being the only person to access the servers administratively.

267. He then charged $275.00 per month, per server (a total of $1100.00) in addition to his hourly rate for the use and maintenance of the equipment he purchased with MJI funds.

268. In 2012, Klump charged MJI roughly $220,000.00 to MJI for IT related expenses.

269. When Fred Leeb took over the CEO position, he approached Relator to explain Klump's IT related expenses.

270. Prior to Leeb approaching Relator, Relator had made numerous requests to Klein, CEO until December 21, 2012, Eliot Globerson, MJI's Finance Manager, and Rebecca Peters for details of IT expenses for the 2012 fiscal year. However, Relator never received a response to her requests.

271. Relator also refused to authorize the hours submitted by Klump for payment because after reviewing the hours Relator discovered that the hours falsified because he was billings for work that Relator had performed. However, Shemtov told Relator that she must be mistaken while Klein was convinced but Klein's hands were tied, as Shemtov's word was always final.

272. By December 21, 2012, Klump had not produced any work in implementing the CAMS software purchased by MJI in August 2012.

273. The CAMS training session Klump conducted in December 2012 was nothing more than a three-day PowerPoint presentation, showing the functions in CAMS. Klump was the sole point of contact to the CAMS Manager. He refused to allow the Three Rivers project team to speak with anyone at MJI other than him.

274. At a meeting with Shemtov on or about December 21, 2012, Relator raised the topics of Klump's elaborate expenses and Klump's role as the sole point of contact for Three Rivers were discussed.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

275.    In a managers meeting on or about December 16, 2012, Klein mentioned that MJI had been receiving fraudulent Pell Grant funds.

276.    After the meeting on or about December 16, 2012, Klein had a private conversation with Relator, where he explained that MJI had received millions of dollars in fraudulent Pell Grant funds for study abroad students and that Becky Peters had been altering student GMS files for years to justify the funds. Klein asked Relator if she thought Klump was aware of this information and was using it to blackmail Shemtov. Klein also stated that eventually MJI will get caught for its actions and Shemtov will blame someone else.

277.    Shemtov instructed Relator to do with Klump as she thought best. However, Shemtov expressed that terminating Klump would be a waste of resources since he had worked at MJI for two years and had valuable information.

278.    As for Klein and his allegations of Pell Grant fraud on behalf of MJI, Shemtov told Relator that there had been some accusations within the Jewish press that circulated in the local Jewish communities and that Klein was not correct in his statement. He further explained that MJI followed all applicable rules regarding Pell Grants and that Klein was no longer MJI's CEO.

279.    Shemtov also instructed Relator to shut down any access that Klein may have had to the MJI data.

280.    It was not until January 2, 2013 that it became apparent the Klein, while CEO at MJI, had set up the Long jump database in his name, effectively locking anyone else at MJI out of using the web application, and taking all the data within the database.

281.    Relator was able to retrieve a data dump from the Long jump office, as the data was protected by Family Educational Rights and Privacy Act (FERPA).

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

282.     Klein paid the Long Jump monthly maintenance fee with the MJI credit card, but had signed the contract with Long Jump using his company title, Moshe Klein & Associates, thus preventing Relator from gaining the customized reports and objects created over the previous four years.

283.     Relator made efforts to communicate with CAMS immediately upon accepting her position as MJI's IT Manager.

284.     Three Rivers informed Relator that it had received instructions from Klump that it was not to discuss the project with Relator.

285.     In late October 2012, Relator received a call from Stacy Roswold, Supervisor of the Project Managers at Three Rivers, about the lack of progress and cooperation at MJI.

286.     The data that Relator had sent Three Rivers for examination to determine conversion strategies yielded that it would not be possible to convert the data.

287.     Relator and Roswold further discussed that MJI's best course of action would be to manually enter all of the existing data, beginning with the Fall 2012 students and working backwards to implement. This the only way to get the student data correctly input.

288.     Roswold promised full support and assistance to MJI in getting this done immediately.

289.     Relator informed both Klein and Shemtov of the phone call and Roswold's recommendation.

290.     Klein was in full agreement with Roswold's recommendation.

291.     However, Shemtov believed that Klump should continue to manage the project and attempt to convert the data himself.

292.     Shemtov allowed Relator to have regular communications with the Project Manager assigned to the MJI implementation, Sandra Lafata.

293.     Also, Shemtov required Klump to provide Relator weekly status reports regarding CAMS, to include Relator in all conference calls with the CAMS team, and to copy Relator on all email communications with Three Rivers. However, Klump never did as Shemtov instructed him and Relator's efforts to discuss Klump's noncompliance with Shemtov's instructions were futile.

**R.     CAMS and Customization Requests**

294.     Throughout the CAMS implementation process, Mann and Yaacov Epstein repeatedly requested that Relator, as the administrator of CAMS, modify certain fields on CAMS.

295.     Mann and Epstein wanted all recruiters in Israel to be given full administrative access to CAMS's financial aid module, registrar module, and student module. Mann and Epstein claimed that such changes were necessary because they would allow the recruiters to handle all student paperwork.

296.     However, as a common business practice, recruiters are never granted access to students' financial records.

297.     Mann and Epstein requested that Relator remove certain document verification requirements on CAMS.

298.     When a recruiter in Israel enrolls students as MJI study abroad students, the recruiter then completes all paperwork for the student (MJI enrollment form and financial aid documents). The recruiter also enters student information into CAMS.

299.     CAMS has four stages for a student: prospect, applicant, accepted, and admitted.

49

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

300.    At the prospect stage, CAMS requires student biographical information.

301.    At the applicant stage, CAMS requires document verification which is satisfied by attaching the document requested. CAMS has a field for the student's Social Security Number. The document verification requirement is to attach a copy of the student's Social Security card to the field.

302.    Once all the required verifications are met, the student becomes an accepted student.

303.    Mann and Epstein requested that Relator make certain modifications in CAMS. Initially, the requests were for changes to the initial CAMS student application. They wanted to add in fields for foreign ID number, I-20 student visa information, host school name, host school location, and name of admission counselor.

304.    Mann and Epstein also wanted the CAMS application to be set up so that when a student signed the application electronically by simply typing in his or her name, the signature would be legally binding.

305.    Complying with Maan's and Epstein's requests would mean that a student would either be a prospect or admitted, removing the applicant and accepted stages.

306.    Removing the document verification requirements would allow for Mann and his recruiters to enroll a student in MJI's study abroad program without ensuring that MJI had the required documents for the student, such as transcript, Social Security number, proof of high school graduation, etc.

307.    Additionally, Mann wanted to be able to run certain reports on CAMS to find out which recruiter had signed up which yeshivas/seminaries and how many students were in each.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

308.     Epstein and Mann directed these requests at Relator because she was the only person with administrative access to CAMS who had a background in computers and was knowledgeable enough to make the edits.

309.     Administrative access to CAMS was determined by a user's role in the organization as well as the individual's actual duties.

310.     Mann and Epstein insisted that because they managed the study abroad program, they should have full administrative access to CAMS. This type of access would permit for the deletion of student records, modification of the data throughout the CAMS application, as well as manipulation of the reporting within CAMS.

311.     Mann and Epstein raised their request with Leeb prior to the three-day March 2013 CAMS training. Leeb called Three Rivers and arranged for Mann and Epstein to have full administrative access to CAMS.

312.     When Relator found out that Mann and Epstein had been granted full administrative access, she removed their administrative status, explaining that their role and function did not require such extensive access. Relator explained that as the IT Manager, her experience qualified her to be the sole administrator and the best person to determine permissions, access, and security within the CAMS or any database for the entire MJI organization.

313.     Until late February 2012, when Leeb requested that Three Rivers give full administrated access to Epstein and Mann, Relator only gave them read/write access to CAMS so that they could input information pertinent to their departments but were unable to make any changes to CAMS.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

314. Once students were enrolled in MJI's study abroad program through CAMS, CAMS triggered an add/drop period and registration deadlines. CAMS required "term" dates to be in place, automatically shutting off the ability to register a student after the designated time.

315. Once MJI found out about these triggers and restrictions, it no longer wanted to use CAMS because MJI regularly enrolled entire schools, regardless of when the semester had started.

316. MJI came up with the idea of creating four block courses. Each semester, MJI set up four block courses in CAMS. A clock course is a blank course. MJI had two block courses for the two MJI courses the students were to take each semester and the additional two block courses were used to separate the female and male students. MJI kept these block courses blank until the end of every semester, when MJI's translators translated the syllabi and course content of the courses the students took at the yeshivas/seminaries and MJI then created course content for the CAMS courses *after* the students had already completed the course.

317. Additionally, MJI regularly used multiple start dates for each semester. For the Fall 2012 semester, Stein added start dates into late November so that the term had five start dates but all finished at the same time in December. As a result, the fall term overlapped with the Winter 2013 term, traditionally January – May. Lafata told Relator that she had never seen a school function the way MJI did.

318. After Relator's constructive discharge on April 28, 2013, MJI eventually terminated its contract with Three Rivers and stopped all communications with the Three Rivers Project Manager, Lafata.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

319.     After MJI ended its contract with Three Rivers, MJI employed TJ Davis, an independent contractor who reports directly to Mann, to log into MJI's CAMS account as an administrator and make all the changes that Mann and Epstein asked Relator to do.

## S.     CAMS March 2013 Training Session

320.     Lafata flew to Michigan to conduct the training session in March 2013.

321.     Lafata and Relator had prepared a training schedule for the training and MJI management had approved it prior to the training session. However, at Leeb's request, Lyne Graham completely changed the previously agreed upon training schedule.

322.     Epstein traveled from Israel to Michigan to personally attend the training sessions, without prior coordination or notice of his trip.

323.     The three days of training were recorded via WebEx and MJI's Israel staff dialed in to the sessions and interacted with the sessions.

324.     Leeb assigned James Jemison as the administrator user on MJI's WebEx account to record these sessions, effectively blocking Relator from obtaining the copies of the sessions.

325.     Rebecca Peters also attended theses training sessions via WebEx as she was recovering from hip surgery.

326.     Additionally, laptops had been setup at MJI for hands on use of the CAMS application and input of student data.

327.     During the training, Mann and Epstein monopolized the training time with personal training requests, administrative access requests, and reporting requests focusing on each recruiter, each host school by recruiter, and ways to determine what paperwork had been completed by the recruiter per student.

328.     During the three-day session, several times a day, Peters, Mann, Herman, and James requested that the recording be paused and the discussions continue "off the record." Off the record, they discussed financial aid issues and how to package student financial aid documents for Pell Grant applications.

329.     MJI had difficulties with processing financial aid documents because the tuition for the yeshivas/seminaries varied. Peters, Mann, Herman, and James also wanted to find out how to bypass CAMS and Department of Education requirements, and how to register a student for a block of four classes without designating those classes until after the end of the semester.

330.     During the training, not only did the study abroad registrar's office attend, but the staff from MJI's main registrar's office as well.

331.     The main registrar's office consisted of four individuals: Alicia James, Ricca Escamilla, Dianne Bernard, and Inger Morrison.

332.     The study abroad registrar's office is responsible for obtaining attendance records, grades, SAP and determining the content taught at the yeshiva/seminary that could be used to satisfy the requirements of an MJI class and then assigning a grade.

333.     The study abroad registrar then submits this information for financial aid purposes and also submits this information to the real registrar. MJI began submitting this information to the real registrar to create the illusion that MJI had real students and a legitimate study abroad program because James was starting to question the legitimacy of MJI's practices.

334.     During the training session, Mann and Epstein requested that the personnel at the yeshivas/seminaries be given access to CAMS as well, so they could input data on their own instead of sending the information to Mann's staff, who would then forward the information to MJI's Michigan office.

335.    However, Lafata and Relator refused to grant yeshiva/seminary instructors and personnel access to CAMS for several reasons. First, the content from the yeshiva/seminary was in Hebrew and CAMS was in English. Second, none of yeshiva/seminary instructors and personnel were employed by MJI, nor would MJI be able to hold them accountable. Additionally, the yeshiva/seminary faculty never provided MJI teaching credentials, proof of education, or professional development.

336.    Mann and his study abroad team in Israel were responsible for the GMS (Grade Management System), an excel workbook, of each student.

337.    The student GMS files were accessed by individuals not associated with the registrar's office.

338.    MJI used a Google Drive to store and share the GMS files and therefore MJI's Israel staff was able to access the GMS files and edit the information in them.

339.    Most changes being made to GMS files came from the financial aid office, specifically Rebecca Peters and Fran Herman, and Mann's staff in the Study Abroad registrar's office.

340.    During the training session with the combined staff, Lafata asked why there were two registrar departments instead of one. While the registrar only handled the registration of sixty-three actual students, the study abroad department handled over 3000 applications.

341.    Lafata explained that for efficiency the departments should be a single unit. However, Mann's study abroad registrar clearly indicated that their department handled enough and would not take on the additional sixty-three students.

342.    Esther Hirschberg and Judy Lane, registrars for MJI's study abroad program, were quite concerned that students' status could not be changed by them, and that certain

documents had to be verified and attached to the student record before this update would be successfully completed.

343.    Hirschberg and Lane stated that it sometimes took months to get the documents from Israel and that the students would be gone if they could not be registered immediately for MJI to obtain documents.  They believed that by using the CAMS system, MJI would lose thousands of students and the money associated with those student enrollments.

344.    After the study abroad team left the CAMS training, Alicia James and Ricca Escamilla, MJI's registrars for MJI's real students, remained for further clarification of the way the system triggered basic events based on the completion of requirements setup in the system.

345.    James was adamant that it would be impossible to use the CAMS registration module as it was because of requirements that a class be listed, an instructor assigned, and a date and time set, as well as a meeting room specified in the Master Course offerings.

346.    From the Master Course offering, classes available for registration during a given semester were determined.  Prerequisites and co-requisites were also assigned to the course in the master offerings.  CAMS did not allow students to register for a class if those requirements were not met.

347.    However, MJI students were enrolled in courses without satisfying prerequisite requirements or required special permission from instructors before signing up for upper level courses.

348.    Using CAMS also limited and locked a course as an MJI course rather than an equivalent course from the yeshiva/seminary or a transferred course. Other restrictions included add/drop periods, term dates and attendance.

349.     James explained that terms were added continually as the study abroad staff in Israel secured new yeshivas/seminaries to become an MJI host school. James also expressed that that her department had to regularly wait until the end of the semester or even the end of the year before they could obtain documentation from the yeshiva/seminary, translate the documents, and then determine what content could be used to satisfy the completion of an MJI course.

350.     The courses the students completed at the yeshivas/seminaries were listed as MJI courses, not equivalent courses or nor transferred credits.

351.     MJI's solution around the issue of waiting to receive course documents from the yeshiva/seminary was to create a block of blank courses, the equivalent of four credit hours per semester, which would allow the registrar's office to insert an MJI course after the close of the term. The block of four credit hours was also essential to trigger the financial aid module within the system.

352.     The use of the CAMS system restricted MJI so it could only operate exactly as the Department of Education allowed.

353.     MJI used its own verification work sheets, institutional student information records (ISIRs), and professional judgment.

354.     Based on MJI's Campus Accountability Report (CAR), ninety-eight percent of students enrolled received Pell Grants. Peters keeps MJI's CAR on her computer.

355.     The CAMS system could also automatically produce CARs and Integrated Post-Secondary Education Data System (IPEDs), a tool used to collect consumer information.  CAMS could also interface with the QuickBooks accounting system. However, CAMS could only issue funds to the student who was the recipient of Pell Grant funds and not the host school.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

356.    Both Peters and Herman stated that the agreement MJI had with the yeshivas/seminaries in Israel required that Pell Grant funds be dispersed to them within six weeks of receiving a student's grade or other document indicating completion of studies.

357.    At the CAMS training session there was discussion that the staff at the yeshiva/seminary be given access to CAMS and also facilitate grading.

358.    The yeshiva/seminary instructors did not take attendance as it was not a requirement of the students attending the yeshiva/seminary. However, proof of attendance is a requirement for Pell Grant recipients, ACICS and the Department of Education.

**T.    Student Dropped and Make-Up Courses**

359.    Judy Lane sent Relator daily requests to drop students after the designated drop period (within three weeks from the beginning of the classes as specified by the Department of Education) for the semester had passed.  When requesting to "drop students," Lane expected that the student would be completely deleted from all systems, erasing the very existence of any interaction with them. These requests often came at the end of each semester and amounted to hundreds of students.

360.    After the ACICS audit in February 2013, Stein and MJI's liaisons in Israel requested that Relator create over 130 make-up courses for the Fall 2012 and Winter 2013 semesters.

361.    The ACICS auditors were not satisfied with the Sakai online classroom content that they viewed and asked that MJI set up makeup courses to satisfy the classroom to homework ratio and also make up for the lack of attendance and the limited amount of content in each Sakai classroom.

362.     Relator received over one hundred requests to create Sakai online classrooms for makeup courses.

363.     However, MJI never held makeup classes because the yeshivas/seminaries were closed in the summer and the makeup semesters could not overlap with the existing fall or winter semesters.

364.     MJI's accreditations expired on December 31, 2013. The ACICS gave MJI until April 30, 2014 to come into compliance with ACICS requirements so that its accreditations would be renewed.

**U.     Relator Complains and is Interrogated**

365.     In January 2013, Relator filed a formal complaint with HR about not being able to perform her duties because Shemtov had blocked her access to data vital to her job performance. She also complained about the sudden lack of cooperation and respect at MJI flowing her return from the end of year holidays.

366.     MJI ignored Relator's complaint and Leeb only inquired if Relator would be suing MJI.

367.     One month after filing her formal complaint with HR, Relator asked for a follow up meeting as Shemtov continued to deny her requests to access MJI's data. MJI took no action.

368.     In March 2013, Leeb instructed Relator to meet with MJI's outside counsel at a Marriott in a business suite. Relator complied. In the suite, Charles P. Elliott and Peter S. Leyton proceeded to question her for over an hour. They also made Relator sign a confidentiality agreement, but she was not given a copy.

369.     The role of the lawyers in the hotel room was purely investigatory. They did not provide Relator any advice.

370.    The lawyers questioned Relator about several of MJI's fraudulent practices. They also questioned Relator about Klein.

371.    The next week, MJI hired Trish Leonard, a specialist in Department of Education Audits.

**V.      Student Achievement Progress Reports**

372.    During the audit, ACICS identified major problems in MJI's Student Achievement Progress Reports – essentially student report cards. The reports lacked formal attendance, and grades were not being entered until six to eight months after the stated completion of the course. MJI should have been entering grades upon the completion of the course and sending the progress reports to students. Accordingly, in April 2013, Relator and others were working on back-filling deficient reports with the required information and sending them to students.

373.    Title IV of HEA programs require that students meet certain GPA, attendance, and other requirements to continue receiving Pell Grant funds.

374.    Relator sent the delayed reports to 1,900 students. She created a mail merge based on information that the registrar provided. Relator printed the addresses directly on the envelopes.

375.    About 1,500 of the reports were returned due to unknown, invalid, or incomplete addresses. Relator's assistant Shamika Lipsey, informed Relator of the mass return of the letters and was concerned that Lipsey had processed the envelopes incorrectly. Relator double-checked the mail merge and discovered that Lipsey had not made a mistake, the student information database was just riddled with errors and incomplete fields.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

376.    MJI would create an MJI.edu email address for each new student.  When Relator followed up on the returned progress reports, she discovered that the MJI.edu email addresses assigned to students were never even accessed or activated.

**W.      Relator Investigates**

377.    Relator then attempted to call some of the students whose reports were returned. Most numbers did not work, but of the "students" she did reach many spoke no English, and most had never heard of MJI.

378.    During her employment at MJI, Relater was able to identify only sixty-three real students who were following a legitimate course of study through MJI. These real students were serviced by the registrar's office, which was separate from the study abroad program. All fraudulent students were serviced by the study abroad office.

379.    Relator drafted a resignation letter dated April 28, 2013 and sent it to Shemtov, Leeb, and Graham. In her letter, Relator listed May 12, 2013 as her last day at MJI. However, MJI changed her final day of work to May 7, 2013.

380.    Before leaving MJI, Relator copied the raw data from Long Jump.  Relator analyzed the data and discovered that since MJI began its scheme to fraudulently receive Pell Grants in 2007, 8709 students have been enrolled at MJI's study abroad program.  For these 8,709 fictitious students, she calculates that MJI has improperly received $40,687,552 in Pell Grants.

381.    Further, Relator discovered that Klein has opened and operates two new accounting offices and a collection agency. One of the accounting offices is located in Chicago, Illinois and the other is located in Arizona. The collection agency is located in Skokie, Illinois.

**X.      Defendants Retaliate Against Relator**

382.     After Relator's constructive discharge, MJI refused to pay her for her last three weeks of work. MJI also refused to payout for Relator's accrued time off, and denied Relator her bonus for the eighty-hour weeks she had worked to prepare for the ACICS audit, as well as her bonus for implementing CAMS ahead of schedule.

383.     Relator filed a complaint with the Wage and Hourly Division of Michigan's Department of Licensing and Regulatory Affairs.  After filing this complaint, MJI paid Relator for her last three weeks of employment at MJI, but did not give her the bonuses and pay for accrued time off that she was entitled to.

384.     Even with her skills, experience, and expertise, Relator has not been able to obtain a new position within the educational community. Relator believes that MJI has actively interfered with her efforts to regain employment. Specifically, Graham informed Relator that MJI would not provide any recommendation or employment verifications for Relator.

**COUNT ONE**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**Against Michigan Jewish Institute**

385.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

386.     By virtue of the acts described in the preceding paragraphs, to facilitate its fraudulent study abroad program and continue to receive Pell Grant funds, MJI knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

387.     As a qualified education institution, MJI must comply with the laws and regulations set forth in the Higher Education Act of 1965 as amended.

62

388.     As an eligible educational institution MJI was required to conduct regular audits and submit attestations to DEd confirming that MJI was in compliance with federal laws and regulations related to the HEA's requirements.

389.     MJI devised a fraudulent scheme of to retain Title IV, HEA funds by enrolling students in MJI's study abroad program without the knowledge or consent of the students and by creating fictitious students.

390.     In addition, MJI enrolled fictitious students in its study abroad program. MJI then applied for Pell Grants for these students.

391.     MJI knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

392.     MJI also falsified student documents to pass an accreditation audit by the ACICS.

393.     Relator has first-hand knowledge of MJI's fraudulent scheme to enroll fictitious student in order to receive Pell Grant funds.

394.     Relator has first-hand knowledge of MJI's fraudulent scheme to enroll students in its study abroad program without the students' knowledge or consent, so that MJI could apply for and receive Pell Grant funds for the students.

395.     Defendant knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

## COUNT TWO
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against Chabad-Lubavitch of Michigan

396.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

397.     By virtue of the acts described in the preceding paragraphs, the Chabad knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

398.     MJI is a close affiliate of the Chabad, and acts at the direction of the Chabad.

399.     The Chabad benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

400.     Defendant knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

**<u>COUNT THREE</u>**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**Against The Shul**

401.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

402.     By virtue of the acts described in the preceding paragraphs, the Shul knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

403.     The Shul benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

404.     The Shul falsified its records to reflect that MJI held classes at the Shul, in an attempt to legitimize MJI's fraudulent practices. As a result, MJI was able to fraudulently obtain Pell Grant funds and the Shul received a portion of the fraudulently obtained Pell Grant Funds.

405.     Defendant knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

64

## COUNT FOUR
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against Friendship Circle

406.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

407.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

408.    Friendship Circle is an affiliate of MJI and the Chabad and MJI.

409.    Friendship Circle falsified its records in an attempt to legitimize MJI's fraudulent practices. As a result, MJI was able to fraudulently obtain Pell Grant funds and Friendship Circle received a portion of the fraudulently obtained Pell Grant Funds.

410.    Defendant knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

## COUNT FIVE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against Rabbi Kasriel Shemtov

411.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

412.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

413.    Shemtov orchestrated and carried out MJI's fraudulent study abroad scheme of to retain Title IV, HEA funds by enrolling students in MJI's study abroad program without the knowledge or consent of the students and by creating fictitious students.

414.    Shemtov fraudulently enrolled Mayanot Birthright participants in MJI's study abroad scheme without the students' knowledge or consent, in order to receive Pell Grant funds from the United States government.

415.    Shemtov created yeshivas/seminaries in Israel so that he could enroll the students from those yeshivas/seminaries in MJI's study abroad scheme without the students' knowledge or consent, in order to receive Pell Grant funds from the United States government.

416.    Shemtov entered into agreements with yeshivas/seminaries in order to purchase lists of students so that he could enroll the students in MJI's study abroad scheme without the students' knowledge or consent, in order to receive Pell Grant funds from the United States government.

417.    Defendant knowingly presented and continue to be presented falsified student information to the Government to receive Pell Grants.

418.    Shemtov also facilitated MJI's falsification of student documents to pass an accreditation audit by the ACICS.

## COUNT SIX
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Against Rabbi Yudi Mann

419.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

420. By virtue of the acts described in the preceding paragraphs, Defendant knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of the FCA.

421. Mann orchestrated and carried out MJI's fraudulent study abroad scheme of to retain Title IV, HEA funds by enrolling students in MJI's study abroad program without the knowledge or consent of the students and by creating fictitious students.

422. Mann represented MJI during his trips to Israel in which he approached yeshiva/seminaries to purchase lists of students so that MJI could enroll them in its fraudulent study abroad program without the students' knowledge or consent, and obtain Pell Grant funds for the students.

423. Mann employed a team of recruiters in Israel in order to target more yeshivas/seminaries.

424. Mann and his recruiters received a commission-based compensation from MJI. Mann received a percentage of the total amount of the study abroad students' tuition, paid for by Pell Grant funds.

425. Mann knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

426. Additionally, Mann also facilitated MJI's falsification of student documents to pass an accreditation audit by the ACICS.

## COUNT SEVEN
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### Against Michigan Jewish Institute

427. Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

67

428. By virtue of the acts described in the preceding paragraphs, MJI knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

429. As a qualified education institution, MJI must comply with the laws and regulations set forth in the Higher Education Act of 1965 as amended.

430. As an eligible educational institution MJI was required to conduct regular audits and submit attestations to DEd confirming that MJI was in compliance with federal laws and regulations related to the HEA's requirements.

431. MJI devised a fraudulent scheme of to retain Title IV, HEA funds by enrolling students in MJI's study abroad program without the knowledge or consent of the students and by creating fictitious students.

432. MJI knowingly falsified study abroad enrollment applications and Pell Grant applications for students who had no intention of signing up for MJI's study abroad program.

433. MJI knowingly invented fictitious students and then falsified study abroad enrolment applications and Pell Grant applications in the names of these fictitious students.

434. MJI forged study abroad enrollment applications and Pell Grant applications easily because all forms require an "electronic" signature, which is a student's name typed on the signature line.

435. As an eligible educational institution, MJI was required to enter into a PPA, in which MJI agreed to abide by a host of statutory, regulatory, and contractual requirements in order to receive Title IV HEA funds.

436. MJI fraudulently entered into a PPA and violated the requirements needed to receive Title IV HEA funds.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

437.    MJI created fictitious students and fictitious personal information to meet the requirements for a Pell Grant, forged students' signatures on Pell Grant applications, and subsequently receive federal funds.

438.    MJI used the names and demographic information of individuals without their knowledge or consent in order to enroll them as MJI students, falsify FAFSA applications for them, and received Pell Grant funds.

439.    MJI knowingly created and submitted falsified documents to ACICS auditors in order to mislead ACICS to renew MJI's accreditations.

## COUNT EIGHT
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### Against Chabad-Lubavitch of Michigan

440.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

441.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

442.    MJI is a close affiliate of the Chabad, and acts at the direction of the Chabad.

443.    The Chabad benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

444.    The Chabad supported and facilitated MJI's fraudulent study abroad program and was fully aware of MJI's fraudulent practices that led to MJI receiving Pell Grant funds.

445.    The Chabad, through its close affiliation with MJI, knowingly submitted falsified financial aid forms in order to fraudulently receive Pell Grant funds.

**COUNT NINE**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**Against The Shul**

446.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

447.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

448.    The Shul benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

449.    The Shul falsified its records and submitted them to reflect that MJI held classes at the Shul, in an attempt to legitimize MJI's fraudulent practices. As a result, MJI was able to fraudulently obtain Pell Grant funds and the Shul received a portion of the fraudulently obtained Pell Grant Funds.

450.    Defendant knowingly presented and continues to be presented falsified student information to the Government to receive Pell Grants.

451.    Defendant knowingly created and submitted falsified documents to mislead ACICS auditors so that the ACICS would renew MJI's accreditations.

**COUNT TEN**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**Against Friendship Circle**

452.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

453.     By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

454.     Friendship Circle is an affiliate of the Chabad Lubavitch and mingled finances with MJI and the Shul.

455.     Friendship Circle falsified and submitted its records in an attempt to legitimize MJI's fraudulent practices. As a result, MJI was able to fraudulently obtain Pell Grant funds and Friendship Circle received a portion of the fraudulently obtained Pell Grant Funds.

### COUNT ELEVEN
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**Against Rabbi Kasriel Shemtov**

456.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

457.     By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

458.     Defendant knowingly falsified MJI enrollment applications and Pell Grant applications for students who had no intention of signing up for MJI's study abroad program.

459.     Defendant knowingly invented fictitious students and then falsified MJI enrolment applications and Pell Grant applications in the names of these fictitious students.

460.     Under Defendant's supervision, MJI forged students signatures on study abroad enrollment applications and Pell Grant applications easily because all forms require an "electronic" signature, which is a student's name typed on the signature line. .

71

461.     Shemtov created yeshivas/seminaries in Israel so that he could enroll the students from those yeshivas/seminaries in MJI's study abroad scheme without the students' knowledge or consent, in order to receive Pell Grant funds from the United States government. Therefore, he knowingly created and submitted false records to obtain Pell Grant funds.

462.     Shemtov entered into agreements with yeshivas/seminaries in order to purchase lists of students so that he could enroll the students in MJI's study abroad scheme without the students' knowledge or consent, in order to receive Pell Grant funds from the United States government. Therefore, he knowingly created and submitted false records to obtain Pell Grant funds.

463.     Defendants knowingly presented and continue to be presented falsified student information to the Government to receive Pell Grants.

464.     Shemtov also facilitated MJI's falsification of student documents to pass an accreditation audit by the ACICS. Therefore, he knowingly created and submitted false records to the ACICS in order to renew MJI's accreditations.

## COUNT TWELVE
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### Against Rabbi Yudi Mann

465.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

466.     By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, of false records to submit Pell Grant applications and receive federal funds.

467.     Defendant knowingly falsified MJI enrollment applications and Pell Grant applications for students who had no intention of signing up for MJI's study abroad program. Therefore, he knowingly created and submitted false records to obtain Pell Grant funds.

468.     Defendant knowingly invented fictitious students and then falsified MJI enrolment applications and Pell Grant applications in the names of these fictitious students. Therefore, he knowingly created and submitted false records to obtain Pell Grant funds.

469.     Defendant forged MJI enrollment applications and Pell Grant applications easily because all forms require an "electronic" signature, which is a student's name typed on the signature line. Therefore, he knowingly created and submitted false records to obtain Pell Grant funds.

470.     Defendant knowingly created and submitted false records to the ACICS in order to renew MJI's accreditations.

<u>**COUNT THIRTEEN**</u>
**Conspiracy to Submit False Claims**
**31 U.S.C. § 3729(a)(1)(C)**
**As to All Defendants**

471.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

472.     Through the acts and omissions described in this Complaint and from on or before at least 2007 through present, Defendants and persons known and unknown, knowingly agreed and conspired to defraud the federal government by having false or fraudulent statements, records, certifications, and claims submitted to and approved by Title IV of the HEA.

473.     The operations of the six Defendants and the yeshivas and seminaries in Israel are so intertwined that they are effectively one single enterprise.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

474.    Defendants conspired with Israeli yeshivas and seminaries as "host schools" to create a database of students who Defendants would then enroll as MJI students. MJI then falsified these students' records in order to receive Pell Grants.

475.    Defendants conspired to falsify information to mislead ACICS auditors in order to renew MJI's accreditations and continue to defraud the federal government.

476.    Through their conspiracy to defraud the federal government, MJI has received $40,687,552 by submitting falsified Pell Grant applications, starting in 2007 and continuing to the present.

## COUNT FOURTEEN
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)
### Against Michigan Jewish Institute

477.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

478.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continue to make and use, false records and statements to transmit money from the federal government.

479.    Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government. Defendant fraudulently received Pell Grant funds from Title IV of the HEA and avoided its obligation to return the money to the federal government.

480.    Defendant acknowledged having to return some of the Pell Grant funding that it had fraudulently received to the federal government. However, it never did so.

## COUNT FIFTEEN
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)
### Against Chabad-Lubavitch of Michigan

74

481.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

482.     By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, false records and statements to transmit money from the federal government.

483.     Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government.

484.     MJI is a close affiliate of the Chabad, and acts at the direction of the Chabad.

485.     The Chabad benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

486.     The Chabad was aware of MJI's fraudulent study abroad program and receipt of fraudulent Pell Grant funds.

487.     Defendant fraudulently benefited from MJI's fraudulent acts that allowed it to receive Pell Grant funds and avoided its obligation to return the money to the federal government.

488.     Defendant knew that it had to return the fraudulently obtained Pell Grant funds, but it failed to do so.

**COUNT SIXTEEN**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Against The Shul**

489.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

490.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, false records and statements to transmit money from the federal government.

491.    Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government.

492.    The Shul benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

493.    The Shul was aware of MJI's fraudulent study abroad program and receipt of fraudulent Pell Grant funds.

494.    Defendant fraudulently benefited from MJI's fraudulent acts that allowed it to receive Pell Grant funds and avoided its obligation to return the money to the federal government.

495.    Defendant knew that it had to return the fraudulently obtained Pell Grant funds, but it failed to do so.

**COUNT SEVENTEEN**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Against Friendship Circle**

496.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

497.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, false records and statements to transmit money from the federal government.

498.    Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government.

76

499.     Friendship Circle benefited financially from the Pell Grant funds that MJI fraudulently collected for its study abroad students.

500.     Friendship Circle was aware of MJI's fraudulent study abroad program and receipt of fraudulent Pell Grant funds.

501.     Defendant fraudulently benefited from MJI's fraudulent acts that allowed it to receive Pell Grant funds and avoided its obligation to return the money to the federal government.

502.     Defendant knew that it had to return the fraudulently obtained Pell Grant funds, but it failed to do so.

**COUNT EIGHTEEN**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**
**Against Rabbi Kasriel Shemtov**

503.     Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

504.     By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, false records and statements to transmit money from the federal government.

505.     Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government. Defendant fraudulently received Pell Grant funds from Title IV of the HEA and avoided his obligation to return the money to the federal government.

506.     Shemtov was fully aware that MJI fraudulently received Pell Grant funds and had an obligation to return the funds. However, he did not instruct MJI to return the funds.

77

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

## COUNT NINETEEN
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)
### Against Rabbi Yudi Mann

507.    Relator alleges and incorporated by reference the allegations made in all of the preceding paragraphs of this Complaint.

508.    By virtue of the acts described in the preceding paragraphs, Defendant knowingly made and used, and continues to make and use, false records and statements to transmit money from the federal government.

509.    Further, Defendant knowingly concealed and knowingly avoided an obligation to transit money to the federal government.

510.    Mann's compensation from MJI depended directly on the amount of Pell Grant funds MJI fraudulently received. As a result, Mann was fully aware that MJI fraudulently received Pell Grant funds and had an obligation to return the funds. However, he did not return the funds.

## COUNT TWENTY
### Retaliation
### 31 U.S.C. § 3730(h)
### Against Michigan Jewish Institute

511.    Klobuchar realleges and incorporates the allegations set forth above as though fully alleged therein.

512.    Klobuchar was an "employee," and MJI is an "employer," as the terms are defined by the False Claims Act.

513.    As set forth above, and in connection with the foregoing scheme, MJI knowingly submitted false claims for payment by the Government in violation of the FCA.

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

514. Klobuchar engaged in protected activity by sharing her complaints about MJI's fraudulent behavior with the former Chief Operations Officer and President of MJI.

515. As a result of Klobuchar's protected activity, MJI retaliated against her by blocking her access to information technology systems that she needed to complete her job duties.

516. As a result of Klobuchar's protected activity, MJI diminished Klobuchar's role over time so that she would no longer have meaningful duties.

517. After informing MJI of the various frauds it had committed, Klobuchar decided that remaining at MJI would be to help perpetuate the frauds that it was committing. Therefore, Klobuchar tendered her resignation.

518. As a result of Klobuchar's protected activity, MJI continued to retaliate Relater after her against diminished Relator after her constructive discharge by withholding her pay for her last three weeks of employment at MJI, the bonuses she was entitled to, and the pay she was entitled to for accrued time off.

519. To redress the harms he has suffered as a result of the acts and conduct of MJI in violation of 31 U.S.C. § 3730(h), Klobuchar is entitled to damages including but not limited to litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States is entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3730, and Relator requests that judgment be entered against Defendants, ordering that:

a. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.;*

79

b.  Defendant pay an amount equal to three times the amount of the damages the United States has sustained because of Defendant's actions;

c.  Defendant pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

d.  Plaintiff/Relator be awarded the maximum amount allowed pursuant to the FCA;

e.  Plaintiff/Relator be awarded two times the amount of back pay, interest on the back pay, and compensation for damages Relator sustained as a result of Defendants' discrimination against her;

f.  Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs;

g.  The United States and Plaintiff/Relator be granted all such other relief as the Court deems just and proper.

October 26, 2017

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

Respectfully submitted,

HARON LAW GROUP

By:      _/s/ David L. Haron_____
         David L. Haron, Esq. (P14655)
         Haron Law Group
         30300 Northwestern Highway, Suite 115
         Farmington Hills, Michigan 48334
         (248) 762-7009
         dharon@haronlawgroup.com
         *Attorney for Qui Tam Plaintiff*

         ____/s/ David L. Scher_____
         David L. Scher, Esq.
         (Admitted to practice in the E.D. of Michigan)
         The Employment Law Group, P.C.
         888 17th Street, NW, Suite 900
         Washington, D.C. 20006
         (202) 261-2806
         (202) 261-2835 (facsimile)
         dscher@employmentlawgroup.com
         soswald@employmentlawgroup.com

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.

Dated:  October 26, 2017

Respectfully submitted,

HARON LAW GROUP

By:      _/s/ David L. Haron_____
         David L. Haron, Esq. (P14655)

81

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*

_/s/ David L. Scher_
David L. Scher, Esq.
(Admitted to practice in the E.D. of Michigan)

*QUI TAM COMPLAINT - CONFIDENTIAL AND UNDER SEAL*